# PHILADELPHIA, BALTIMORE AND WASHINGTON MARBLE AND TILE COMPANY *v.* JOHN HILTZ & SONS COMPANY ET AL.

*Mechanic's Lien—Performance of Contract—Evidence.*

In *scire facias* by a subcontractor to enforce a lien for materials and labor furnished, *held* that the direction of a verdict for defendant was erroneous, in view of evidence that plaintiff's discontinuance of work under his subcontract was justified by defendant's refusal to pay for work done and material furnished thereunder.

*Decided May 21st, 1926.*

Appeal from the Circuit Court for Frederick County (PETER, J.).

*Scire facias* by the Philadelphia, Baltimore and Washington Marble Company against the John Hiltz & Sons Company and the Independent Order of Odd Fellows of the Domain of the State of Maryland. From a judgment for defendants, plaintiff appeals. Reversed.

The cause was submitted on briefs to BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT. DIGGES, PARKE, and WALSH, JJ.

*Harry C. Hull* and *Francis H. Urner,* for the appellant.

*Guy K. Motter* and *John Holt Richardson,* for the appellees.

PATTISON, J., delivered the opinion of the Court.

The John Hiltz & Sons Company, one of the appellees, agreed in writing with the Grand Lodge of Maryland, Independent Order of Odd Fellows, Incorporated, to furnish the material and to erect for it a group of buildings near Frederick, Maryland.

Thereafter the John Hiltz & Sons Company entered into an agreement in writing with the appellant, the Philadelphia, Baltimore and Washington Tile Company, by which the latter agreed, for the sum of nineteen thousand five hundred dollars, "to furnish and set in place complete" in said buildings, the "interior marble, tile and terrazzo work" in conformity with the plans, drawings and specifications forming part of the contract between the John Hiltz & Sons Company and the Independent Order of Odd Fellows, "subject to the conditions and terms set forth in 'the Code of Practice' found on the reverse side of said agreement.

The appellant, being required to do so by the general contractor, gave bond, with the Federal Insurance Company as surety, for the proper performance of said contract by it; and on the 26th day of May, 1924, started work under its contract. At the end of June, an invoice, dated June 30th, for the work done and material furnished by the appellant,

amounting to two thousand one hundred sixty-seven dollars and sixty cents, was submitted to the general contractor, John Hiltz & Sons Company and demand was made for its payment. One thousand dollars, and no more, was paid as a credit thereon.

At the end of July, a second invoice, dated July 31st, was submitted to the general contractor for payment. This invoice, amounting to seven thousand one hundred ninety-eight dollars and eighty-four cents, was for the work done and materials furnished by the appellant for both June and July, though it was subject to the credit of one thousand dollars already mentioned, made as of July 18th. Demands were made upon John Hiltz & Sons Company, Incorporated, for payment owing under said invoice, the last demand being on August 12th, 1924, and nothing further being paid thereon, the appellant, on the next day, withdrew its laborers from the job and ceased work thereon.

On the 30th day of August the appellant filed in the Circuit Court for Frederick County its mechanic's lien against the property mentioned for work done and materials furnished by it in the erection of said buildings under its contract with the John Hiltz & Sons Company, amounting to seven thousand one hundred sixty dollars and thirty cents. This amount included material furnished and placed by the appellant upon the premises to be used in the buildings being erected thereon, though not so used at the time the appellant stopped work upon the buildings but, as claimed by the appellant, thereafter used by the general contractor or others in the erection of said buildings.

Upon the account filed with the lien claim were credits, exclusive of the one thousand dollars already mentioned, amounting to three thousand eight hundred sixty-three dollars and forty-seven cents, which represented in the most part payments made by the John Hiltz & Sons Company at the request of the appellant to those who had furnished it material used by it in said building.

On November 13th, nineteen hundred and twenty-four, a

writ of *scire facias* was issued out of the Circuit Court for Frederick County, for the enforcement of the payment of said lien, to which the following pleas were filed: 1st. That the materials were not furnished and the sum of money was not due and unpaid as alleged. 2nd. That the contract for the said materials was made with an architect, builder or person other than the owner of the lot on which the buildings were erected, and that the plaintiff did not, in manner and form as required by the Act of Assembly in such case made and provided, give notice of the same and of their intention to claim the benefit of the alleged lien. 3rd. That no lawful sufficient claim or lien was filed as required by the Act of Assembly. Issue was joined on these pleas. The case was tried by the court sitting as a jury, and a verdict rendered by it for the defendant, upon which a judgment was entered. It is from that judgment that this appeal is taken.

The record contains but one exception, and that is to the ruling of the court in granting the defendant's prayer instructing itself that there was no evidence in the case legally sufficient to entitle the plaintiff to recover.

The contract between the appellant and the John Hiltz & Sons Company, already mentioned and referred to, was formed or made by the John Hiltz & Sons Company accepting the written proposal of the appellant to do the work and furnish the materials at and for the sum mentioned. This proposal, however, was, as we have said, subject to the conditions and terms set forth in the "Code of Practice" found upon the reverse side of the proposal, "which conditions and terms" as stated therein, "constitute the basis of all contracts and agreements." Among the conditions and terms referred to are found the following: 1st. "Provisions in the agreement must be made for payment at least once a month on a basis of 90 per cent. on materials installed," and 2nd. "In case of deferred payments, the title contractor reserves the right to stop his work until satisfactory arrangements for initial and subsequent payments are made."

The evidence of the appellant or sub-contractor is that it started upon the work under the contract on the 26th of

May, 1924; that at the end of June it submitted to the general contractor an invoice showing the amount of work done and material furnished by it to that time, which, upon inspection and measurement, amounted in value to two thousand one hundred sixty-seven dollars and sixty cents. On this invoice one thousand dollars was paid on July 18th following. The appellant continued with its work and at the end of July made and submitted to the general contractor a second invoice, which included the amount owing under the first invoice, subject to the credit of one thousand dollars, and the amount owing for work done and materials furnished by it in the month of July, showing the whole amount by inspection and measurement to be seven thousand one hundred ninety-eight dollars and eighty-four cents, less said credit of one thousand dollars. While the invoice submitted to the general contractor was for the amount stated, the plaintiff expressed a willingness to accept a much less sum as a credit upon it, but it seems that no agreement could be reached by the parties as to what should be paid, and nothing was paid, and the appellant discontinued its work upon the buildings and withdrew its workmen therefrom.

Mr. Salters, president of the appellant company, when asked why he stopped work under the contract, replied: "We stopped because of the manner in which we felt we were being treated on the job, and the fact that the contractor was calling on our bondsman, and the fact that we considered he was over-due in his payments."

Mr. Shutts, who it seems was employed by the defendant below as an estimator and who at the time of the controversies mentioned was in charge of the erection of the buildings, testified that it was he who gave the order for the check of one thousand dollars to "go out" to the appellant, that subsequent demands were made at other times upon his company for the payment of other sums and, when asked concerning the times of the demands made, he replied: "I don't just remember the time but our friend brought in a bill. I said, 'I'll have to look this up before I can pay you any more money,' so I didn't pay any more money. A short while

afterwards I got to talking the same thing over. Him and I naturally got to talking and got mad at one another and he left in a huff and I came up to look the situation over to see whether he was entitled to anything.' "

He, the witness, thereafter checked over the situation, he says, and subsequently communicated by letter with the appellant, suggesting "how we would arrange in the future to make payments on the job in reference to his contract price and how I would pay him. I didn't agree to pay him anything. I told him that was the way I would pay him as he made his claims to meet his prices." The letter was then produced in evidence showing the manner in which he suggested the payments should be made. After writing the letter he had a conversation with Mr. Salters, the president of the appellant company, to whom he said: "Well I call that a law of judgment. I said there's no other way for me to arrive at paying you on the basis that you come in here every now and then and want money. I have used this method at arriving at a price that will allow me to pay for your unfinished or finished work as you go along." This, he said, was not satisfactory to Mr. Salters. "He wanted one thousand dollars cash, and one thousand five hundred dollars in notes, or he wanted one thousand five hundred dollars in cash or one thousand dollars in notes." This request it seems was not granted. The witness was then asked if he had checked up what was actually done up to that time, and he said: "I made what you might call a casual check to see if he had enough work to pay him for it, because to come down to the facts he hadn't enough finished work to pay for it. I had to go outside of my jurisdiction to pay for things he put in the walls and things like that. I had done that on the first deal and then they brought in the second bill." Q. "Now, did you offer to pay him anything at all?" A. "No, I don't remember offering Salters money. I believe I wrote a letter to Salters though, showing him how I could arrive at paying him some money. It strikes me about that time I got a lot of notices from some of his men that they weren't being paid." Upon cross-examination he was asked: "Why

didn't you give him some (money) ?"  Ans. "Simply because of the conditions of his mechanics and his materials, taken in connection with the amount of money that he had expended on the job, would not allow me to give him money freely."

After the appellant stopped work upon the job, it was taken over by the general contractor and it is in evidence that the amount thereafter expended in doing the work and furnishing the material that was to be done and furnished by the appellant, together with that which he had paid the appellant for the work he had done, was about five thousand dollars in excess of the amount at which the appellant had agreed to do the work and furnish the material.

The real question in the case is: Did the defendant breach the contract by its failure and refusal, without good and sufficient cause, to pay for the work done and material furnished when the money therefor became due and payable under its contract with the plaintiff ?  If it did, then the plaintiff was justified in discontinuing its work upon the buildings and was entitled to recover the value of the work done and materials furnished to such time under the contract.  *Brantly on Contracts* (2nd ed.), p. 408.  The evidence of the plaintiff was, we think, legally sufficient to have been considered by the court sitting as a jury, tending to show a breach of the contract by the defendant, but we are not to be understood as holding that the evidence was sufficient to justify a verdict for the plaintiff.  Upon that we do not pass at all. We merely decide that the evidence was legally sufficient to be considered by the court.  As the judgment will be reversed and a new trial awarded, we will not further discuss the evidence or the weight of it.

Because of the rulings of the court in granting said prayer of the defendant, the judgment will be reversed and a new trial awarded.

> *Judgment reversed, new trial awarded with*
> costs to the appellant.